IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ELAINA TURNER and ULYSSES GREEN, | ) ) |
| | ) Case No. 15 CV 06741 |
| Plaintiffs, | ) |
| | ) Judge Sharon J. Coleman |
| v. | ) Magistrate Judge Susan E. Cox |
| | ) |
| CITY OF CHICAGO, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter comes before the Court on defendant City of Chicago's motion for a protective order, which would permit it to shield 167 documents from discovery on the basis of three privileges: attorney-client, deliberative process, and work product (or, in some instances, a combination of two privileges). For the reasons stated herein, the Court grants this motion with a few exceptions discussed below.

## BACKGROUND

Plaintiffs allege that Elaina Turner was tased and arrested by Defendant Officer Patrick Kelly ("Kelly") during an attempt to tow Ulysses Green's automobile on August 2, 2013. (Am. Cmpt. at ¶ 8-11.) Plaintiffs further allege that the tasing caused Turner to suffer a miscarriage.[1] (*Id*. at ¶ 11.) Following the incident, Defendants allegedly pursued criminal charges against the Plaintiffs, but Plaintiffs prevailed in the underlying criminal matter. (*Id*. at ¶¶ 13-15.) According

---

[1] The operative complaint in this matter brings the following causes of action: 1) a *Monell* claim against the City of Chicago for allowing Kelly to go out on patrol and carry, display, and fire his taser, despite knowing of his "dangerous propensities involving the use of his service weapon," and failing to properly train or supervise Kelly on the use of the taser; 2) false arrest pursuant to 42 U.S.C. § 1983, 3) excessive force pursuant to 42 U.S.C. § 1983, 4) failure to intervene pursuant to 42 U.S.C. § 1983, and 5) conspiracy pursuant to 42 U.S.C. § 1983.

1

to Plaintiffs, Kelly has a lengthy history of reported misconduct in his duty as a police officer, as well as two arrests for assault and battery while off duty. (*Id.* at ¶¶ 35-59.) During the criminal proceedings underlying this case, Plaintiffs obtained an order from a state court judge ordering the Independent Police Review Authority ("IPRA") "to produce all CR files and internal investigations relating to Defendant Kelly." (Dkt. 63 at ¶ 4.) On June 29, 2015, IPRA produced documents that it purported to be the entire CR file and investigative file for Kelly. (Dkt. 63 at ¶ 5.) However, as we noted in our previous opinion recommending sanctions against the City, the City failed to produce investigative records relating to Officer Kelly that did not result in a "CR" file, but had triggered an automatic investigation by IPRA (because the incidents involved a police shooting); the Court found that this failure constituted a significant discovery violation. (Dkt. 122.) The Court also recommended that Defendants provide the Plaintiffs with a "certification attesting that a complete and exhaustive search has been conducted and all investigative files relating to Defendant Kelly have been produced." (*Id.*).

To date, Defendants have produced many documents relating to Officer Kelly, including close to 700 e-mail communications about the status of ongoing IPRA investigations. However, the City withheld 167 emails as privileged, as discussed above. After meeting and conferring with Plaintiffs' counsel about the assertion of this privilege, the City filed the instant motion seeking a protective order prohibiting disclosure of the documents it was withholding. At the hearing on the instant motion, the Court ordered that the withheld documents be produced for *in camera* review and set a briefing schedule. The Court has reviewed the parties' briefs and the withheld documents, and the matter is now ripe for disposition.

A few preliminary matters need to be understood before we proceed further. First, after this case was filed, IPRA reopened two investigations of Officer Kelly which previously were

2

closed. These are the IPRA investigation of the tasing incident in this case and what we will refer to as the LaPorta investigation (CR # 1033096). Regarding the IPRA investigation of the facts underlying this case, the City already has informed Plaintiffs that it has reopened the IPRA investigation after obtaining certain materials in the course of this case, including fitness for duty records, depositions, and other discovery materials. The City has also produced an IPRA memo in this case dated January 11, 2017, setting forth what additional investigative steps have been taken since it reopened the case and which steps still remain. The LaPorta investigation concerned an incident in which Kelly's service weapon was discharged and shot LaPorta (Kelly's friend) in the head; a complaint was sustained against Officer Kelly on a number of different grounds, but he was exonerated on an allegation that he shot LaPorta. As far as the Court can determine from its review of the documents set forth in the privilege log, there is only one IPRA summary report regarding the LaPorta incident among the documents: Doc. 8, CR #1033096, as well as related communications about the IPRA investigation. The Court will discuss what can and should be revealed to Plaintiffs about this matter below.

In addition to the two investigations discussed above, other documents relating to at least two other IPRA investigations are being withheld, including draft report and communications about those reports. Two of these investigations, #1068325 (Docs. 83-84, 152-153) and #1072859 (Doc. 125), are irrelevant to this case. In the first, Officer Kelly is not identified as a participant in the alleged misconduct. In the second, he has nothing to with the allegations of the complaint, but merely transported the complainants. His own conduct in this case was not questioned. As these matters are irrelevant to any issue in this case, the City does not have to produce these documents and the Court need not reach any alleged privilege questions.

The remaining documents fall into three different categories: 1) draft IPRA reports on complaints, many of which contain annotations reflecting questions and advice about the facts asserted in these drafts by IPRA attorneys and other personnel; 2) e-mail communications about decisions made during the course of investigations, and providing advice (often from IPRA attorneys) about how best to proceed in an investigation and preliminary opinions offered about IPRA findings—again often by IPRA attorneys, but by other personnel as well; and 3) communications which relate not to IPRA investigations, but rather to matters before this or other courts concerning ongoing cases. As to the first category, the City asserts only the deliberative process privilege. Regarding the second, if the communication is authored by or written to an IPRA in-house lawyer, or even copied to an IPRA attorney, the City claims both deliberative process and attorney-client privilege. On the final category, the City claims that that those documents are protected by the attorney-client privilege and/or the work product privilege. With these categories in mind, we turn to the legal standards which govern the applicable privileges.

## DISCUSSION

### I. Deliberative Process Privilege

The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency. *U.S. v. Farley*, 11 F.3d 1385, 1389 (7th Cir.1993) (citing *N.L.R.B. v. Sears, Roebuck & Co*., 421 U.S. 132, 150–51 (1975)). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dept. of Interior v. Klamath Water Users Protective Ass'n,* 532

U.S. 1, 8–9 (2001) (internal quotations omitted). In keeping with this stated goal, the deliberative process privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated." *Id.* at 9. A document will be protected "only if it is 'predecisional'—generated before the adoption of an agency policy—and 'deliberative'— reflective of the give and take of the consultative process." *Allen v. Chicago Transit Auth.*, 198 F.R.D. 495, 502 (N.D.Ill.2001). This means that "[c]ommunications made subsequent to an agency decision are . . . not . . . protected." *Farley*, 11 F.3d at 1389. Additionally, "[t]he deliberative process privilege is qualified and 'may be overcome when there is a sufficient showing of a particularized need to outweigh the reasons for confidentiality.'" *Anderson v. Cornejo*, 97 C 7556, 2001 WL 826878, at *2 (N.D. Ill. July 20, 2001) (quoting *Farley*, 11 F.3d at 1389).

The City claims over 118 documents are protected by the deliberative process privilege and should not be produced. Plaintiffs make three different arguments in urging the Court to order disclosure of the documents. The first is that the City did not support the assertion of the privilege with an affidavit. An assertion of this privilege requires: "(1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents." *K.L.v. Edgar,* 964 F.Supp. 1206, 1209 (N.D. Ill. 1997). Although the City's motion inexplicably did not include such affidavit, it supplemented its motion with a thorough affidavit by Helen O'Shaughnessy, IPRA's general counsel, which more than satisfies this test. The statements in the affidavit are substantially similar to those found to be sufficient by Judge Chang in a substantially similar affidavit from

5

Ms. O'Shaughnessy submitted in *Holmes v. Hernandez,* No. 14 C 8536, (N.D. Ill. Nov. 21, 2016). The Court finds that the documents being withheld are described in sufficient detail and Ms. O'Shaughnessy clearly establishes the asserted rationale for preserving their confidentiality. Therefore, IPRA has established a prima facie case for the application of the privilege.

Plaintiffs' second argument is that the City's production of both unspecified e-mails and at least one draft summary report regarding the tasing incident underlying this case waived the privilege as to all of the documents; this is not so. The release of other documents (which Plaintiffs does not even identify in its response to the City's motion) does not waive the privilege for all related documents, but only for the document or information specifically released. *Howard v. City of Chicago,* 2006 WL 2331096, at *7 (N.D. Ill. Aug. 10, 2006) (quoting *In re Sealed Case,* 121 F.3d 729, 741 (D.C. Cir, 1997)). The only case which Plaintiffs cite for extending the waiver to all documents does not support their position. *See Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat'l R.R. Passenger Corp.,* No. 6:02-CV-126, slip. op. (M.D. Fla, August 19, 2003).

Plaintiffs do not further challenge the application of the deliberative process privilege to the documents. Their final argument is that the privilege should be overcome in this case because of Plaintiffs' particularized need for the documents to prove their case. The Court must consider the following factors to determine whether Plaintiffs have met this burden: (1) the relevance of the documents to the litigation; (2) the availability of other evidence that would serve the same purpose as the documents sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which disclosure of the documents sought would tend to chill future deliberations within government

agencies, or hinder frank and independent discussion about government policies and decisions. *See Anderson*, 2001 WL 826878, at *2.

Plaintiffs argue that their Complaint alleges that the City and IPRA have intentionally protected, covered-up, and failed to hold Officer Kelly accountable for his "long history of violent misconduct, which caused Plaintiffs' unconstitutional violations to occur." For this reason, they contend, the City's intent (which can only be revealed through its deliberations) is critically important to Plaintiffs' *Monell* claim. However, if this rationale were accepted by the Court, the privilege would be overcome in any case in which the government's intent is called into question, rendering the deliberative process privilege a nullity in any case with a *Monell* claim. The Court believes that the mere allegation that a governmental unit acted improperly cannot open the door to its entire decision-making process without a further and careful examination of the relevance of the particular documents to the specific allegations in the case.

According to Plaintiffs, the inadvertent disclosure of one of the draft summary reports proves the centrality of these documents to their claims. They contend that the document "shows IPRA Chief Administrator directing this investigation and informing her investigator on how to discredit Plaintiffs Turner's accounts within the report, ignoring and failing to address the clearly discredited version of events from Officer Kelly, and ignoring the undisputed contradictions and physical evidence of Turner's physical injuries (i.e. taser wounds) that contradict Officer Kelly's version of the events entirely." (Dkt. 137 at 8-9.) The Court has reviewed the draft reports and communications regarding this complaint and does not find that they show that this nefarious conduct is taking place. In fact, the contrary appears to be the case. The successive drafts and surrounding correspondence – including the decision to re-open the investigation in light of the discovery in this case – point to the opposite conclusion. The documents suggest that IPRA

7

personnel are trying to conduct a thorough investigation. That IPRA originally may not have had all of the relevant information regarding Officer Kelly's disciplinary history may have resulted in an incomplete analysis, but the documents at issue in this motion shed no light on that question. They are instead a series of successive drafts of a report by an IPRA investigator which include edits, comments, questions, and responses by others in the chain of command such as attorneys, investigative personnel, and the Chief Administrator. The communications surrounding these drafts are discussions about the steps to be taken in the ongoing investigation, reporting on how those steps are progressing, and preliminary findings and opinions regarding the probable outcome of the complaint.

This case clearly is distinguishable from the *Holmes* case relied on by Plaintiffs. In that case, there was specific evidence that a former IPRA investigator, Lorenzo Davis, had come forward to assert that IPRA fired him for refusing to change his recommendations. Thus, Judge Chang found that Plaintiffs needed to be able to review drafts of the IPRA summary reports to determine whether they were being edited to be more "officer-friendly." Their relevance to the case was not, therefore, speculative. But the Court's review of the summaries and other documents in this case do not substantiate a theory that evidence is being suppressed or manipulated in such a fashion. The marginal relevance of these documents weighs in favor of maintaining the privilege, particularly when Plaintiffs have access to the final summary reports, investigative files, evidence, and witnesses identified in these reports.[2]

The remaining factors clearly balance in the City's favor. This litigation does raise serious questions about the efficacy of IPRA investigations for the reasons the Court has just identified.

---

[2] And, it is clear from the evidence that Plaintiffs will have adequate fodder for their arguments, considering that despite Officer Kelly's lengthy list of sworn complaints against him, involvement in at least two shootings, previous suspensions and fitness for duty issues discovered in the discovery in this case, he continued to work as a police officer. Perhaps most significantly for Plaintiffs, the last summary report in this case does not even mention Kelly's prior checkered history, but nonetheless finds the complaint without merit.

8

But the Court is reluctant on this record (in which the content of the communications do nothing to advance Plaintiffs' theory) to override the privilege on this basis. Such a holding would mean that in each case where a Plaintiff alleges an ineffective investigation by IPRA, IPRA's documents would be an open book. There is no question that this would chill a free and frank discussion among IPRA personnel about the merits of any particular issue or decision during an investigation. IPRA personnel would be reluctant to challenge or criticize each other's views or decisions for fear that this could be cited as evidence in a future case. It seems clear to the Court that allowing such discovery every time IPRA's investigation is challenged as inadequate in a civil case would weaken the agency significantly and hinder its personnel from undertaking the thorough investigations its complainants deserve. Thus, we do not find that the privilege is overcome by Plaintiffs' need for the documents.

However, that does not completely end the inquiry. The deliberative process privilege does not extend to a discussion of objective facts, as opposed to opinions and recommendations. *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87–88, 93 (1973) ("[M]emoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery."); *Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. N.L.R.B.,* 845 F.2d 1177, 1180 (2d Cir.1988) ("Purely factual material not reflecting the agency's deliberative process is not protected."); *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1227–28 (10th Cir.2007); *K.L. v. Edgar,* 964 F.Supp. 1206, 1208 (N.D.Ill.1997). "To be considered 'deliberative,' a document should reflect policy or decision-making processes, rather than purely factual or investigative matters." *S.E.C. v. Nacchio,* No. 05 C 0480, 2009 WL 211511, at *3 (D.Colo. Jan. 29, 2009) (citing *Trentadue,* 501 F.3d at 1227). Purely factual information must therefore be segregated from other materials

which are protected. The Court will now turn to the specific documents being withheld by the City and determine whether those materials contain protected deliberative process information, or purely factual information that must be produced.

A. <u>Summary Reports and Related Materials</u>

We already have ruled that Documents 83-84, 152-153 and 125 are not relevant to this case and need not be disclosed. We further order that the City need not produce Documents 9, 41-52; 59-61; 64-70, 71, 73-79; 101-102; 104-105; 114-124. Each of these documents reflects internal communications regarding IPRA's deliberative process relating to Summary Report #1063990 (the tasing incident), and falls squarely within the deliberative process privilege.

The City has also withheld Doc. 8 (summary of the LaPorta shooting complaint against Officer Kelly, #1033096) and Doc. 12 (shooting complaint against Officer Kelly, #1068458). There is nothing on the face of either of these reports which indicates they are not final summary reports and so the Court does not understand why the privilege is being asserted here. The Court is aware that IPRA recently has re-opened the investigation into the LaPorta shooting because there is new evidence to consider, but believes that Plaintiffs should be permitted to review the current (and only) conclusion reached by IPRA as set forth in the report. Therefore, Docs. 8 and 12 must be produced.

B. <u>Internal IPRA Communications</u>

The Court finds Doc. 4 and 5, consisting of correspondence between an IPRA attorney and staff about steps to be taken in the LaPorta case, are covered by the deliberative process privilege. Docs. 6 and 7 state preliminary findings in the same investigation and need not be disclosed. Docs. 13, 14 and 16 comprise an e-mail chain between IPRA's General Counsel and

IPRA staff about the status of the tasing investigation and steps to be taken before issuing a final report. These also need not be produced.

Docs. 17-21 are an e-mail chain between IPRA General Counsel and personnel regarding conversations with Plaintiffs' attorneys in the instant case and the reasons why IPRA did not take officer statements. The e-mail chain also offers opinions about the credibility of certain witnesses. It should not be disclosed.

The first part of Doc. 34 reveals an opinion about the likely outcome of the tasing complaint and should remain confidential. The Plaintiffs are entitled to the second half of the e-mail which relates a fact: that Officer Kelly and three other officers are up for commendations in the department. That information is not covered by the deliberative-process privilege.

Docs. 38-40, which deal with new facts that have been discovered in the LaPorta investigation, are a mixed bag. Doc. 38 is a communication that discusses new information which had come to light in the LaPorta investigation. This e-mail is prompted by a message from an IPRA attorney to an IPRA staff member describing those facts. Although an attorney authored this e-mail, nothing in it offers legal counsel or opinions of any kind; it simply is a recitation of facts that have come to light publicly in the LaPorta civil matter. It is not, therefore, protected by the attorney-client or deliberative process privileges. Plaintiffs are entitled to the second half of Doc. 38, but not the response which details steps IPRA personnel plan to take in response to these new facts in first half. Docs. 39-40 and 53-57 are covered by the deliberative-process privilege because they discuss these investigative steps. Doc. 71 is a summary by IPRA's General Counsel to its Chief Administrator about her thoughts on the draft report in the tasing investigation; Docs. 160 and 161 are requests for certain investigative steps in that case. Both are privileged. Docs. 80-82 are discussions among IPRA personnel about further actions to

be taken in the LaPorta case, again, covered by the privilege. Docs. 108-113 and 126-134 are communications describing actions IPRA should take in response to new information in the LaPorta case, as well as information IPRA personnel intend to review for these purposes and are privileged. Docs. 135-142 comprise communications between IPRA attorneys and IPRA personnel about the draft summary report. These are also privileged.

Docs. 143 and 145-150, 155-156 are communications about the investigative plan for the now re-opened LaPorta complaint and are privileged. Doc. 157 is a letter from IPRA (author not identified) to Chicago Police Superintendent Eddie Johnson asking his permission to re-open the LaPorta investigation based on new evidence. The letter (which may be a draft) simply identifies the "objective facts" that have caused IPRA to request that the complaint be re-opened. There is nothing deliberative about the factual matters in the letter and it should be produced. Doc. 158 is the e-mail transmittal of this letter asking IPRA Chief Administrator for comments. Again, there is nothing deliberative here. Docs. 165-166 are communications from an IPRA attorney to the Chief Administrator about how to proceed in the Kelly tasing investigation and are privileged. Finally, the last document, Doc. 167, is a memo to the file summarizing the legal rationale for re-opening the Kelly tasing case and is privileged.[3]

## II. Attorney-Client and Work Product Privileges

While there is no specific federal standard for attorney-client privilege, the Federal Rules of Evidence state that all privileges (except to the extent they pertain to claims or defenses governed by state law) are governed by "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. The Seventh Circuit has recently reiterated that in order for the common law

---

[3] Having sustained the deliberative process privilege for all of the documents which the City alternatively claims are protected by attorney-client privilege, the Court only rules on those documents for which only the attorney-client or work product privileges are asserted as the reason for withholding them.

attorney-client privilege to cover a communication, the court must determine: (1) whether legal advice was sought from an attorney in his or her capacity as an attorney and (2) whether the communication was related to that purpose and made in confidence by the client. *Sandra T.E. v. S. Berwyn Sch. Dist. 100,* 600 F.3d 612, 618 (7th Cir.2009) (citing *United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir.1997)).

The work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). In determining whether the work product privilege applies, a court must examine whether the sought-after documents convey an attorney's thought processes and mental impressions. *Sandra,* 600 F.3d at 621–22. The party seeking work product protection to prevent discovery bears the burden of proof to demonstrate that the disputed material was prepared in anticipation of litigation. *FDIC v. Fidelity and Deposit Co. of Md.,* No. 3:11–cv–19–RLY–WGH, 2013 WL 3989140, at *2 (S.D.Ind. Aug.2, 2013).

Plaintiffs make two objections to the assertion of these privileges. The first is that it was unclear from the log tendered by the City the identities of the attorneys. But this was rectified by the O'Shaughnessy affidavit in which all IPRA attorneys are specifically identified. The second is that IPRA did not show that the communications were for the purpose of seeking or obtaining legal advice or, with respect to the work product privilege, were prepared for or obtained because of litigation.

The communications over which the City asserts an attorney-client privilege are internal communications between IPRA lawyers and IPRA staff, but that does not make them any less privileged if the purpose of the communications is to seek or give legal advice. The City of Chicago ordinance creating IPRA confers a number of powers on the Chief Administrator

13

including "to conduct investigations in a manner consistent with Article IV of Chapter 2-84, the rules and regulations established by the police board, and all department operating procedures, general orders, collective bargaining agreements, and other applicable laws and regulations." CHICAGO, ILL., CODE § 2-57-040(g). Accordingly, it is not surprising that IPRA lawyers frequently consult with IPRA staff about ongoing investigations. In this way, these lawyers act as in-house corporate attorneys whose legal advice to other corporate personnel is protected. *Upjohn Co. v. United States,* 444 U.S. 383, 394-99 (1981). And this privilege extends to factual investigations made by an attorney to provide legal advice to the client and therefore any factual statements made by the employee for this purpose are protected. *Sandra T.E.*, 600 F.3d 612 at 619-20.

The Court has reviewed all of the documents over which either privilege has been asserted and sustains the privileges. Each of the communications between IPRA attorneys and their staff are for purposes of fulfilling their role under the operative ordinance to ensure an appropriate and lawful investigation. Similarly, the documents over which the work-product privilege has been asserted are drafts of documents prepared for litigation, many of them in response to matters which have arisen in the instant case. The City is entitled to withhold these documents.

## CONCLUSION

With the exception of those documents noted herein, the City's motion for a protective order is granted.

Date: 2/10/2017

_____

U.S. Magistrate Judge, Susan E. Cox